J8MPRIVC

1 UNITED STATES DISTRICT COURT
  SOUTHERN DISTRICT OF NEW YORK
2 ------------------------------x

3 UNITED STATES OF AMERICA,

4    v.       19 CR 529 (PAE)

5 KELLY RIVAS,

6     Defendant.

7 ------------------------------x

8           New York, N.Y.
           August 22, 2019
9           2:35 p.m.

10

 Before:
11
       HON. PAUL A. ENGELMAYER,
12
           District Judge
13

14       APPEARANCES

15

 GEOFFREY S. BERMAN,
16   United States Attorney for the
    Southern District of New York
17 DANIELLE SASSOON
 HAGAN C. SCOTTEN
18 DANIEL NESSIM
   Assistant United States Attorneys
19

 ANGUS JAMES BELL
20   Attorney for Defendant

21

 ALSO PRESENT: ERIKA DE LOS RIOS, Spanish-language Interpreter
22
        SPECIAL AGENT WILLIAM CLARK, Homeland Security
23
        ANDREW KESSLER-CLEARY, Pretrial Services
24

25

J8MPRIVC

1          (In open court)

2          (Case called)

3          MS. SASSOON:  Good afternoon, your Honor.  Danielle

4   Sassoon, Hagan Scotten and Daniel Nessim for the government,

5   and we're joined at the counsel table by William Clark, a

6   special agent with Homeland Security Investigations.

7          THE COURT:  All right.  Very good.  Good afternoon,

8   Ms. Sassoon, Mr. Nessim, Mr. Scotten, and good afternoon, Agent

9   Clark.  All right.  Very good.  Good afternoon.

10          And for the defense?

11          MR. BELL:  Yes, your Honor.  James Bell for Ms. Rivas.

12          THE COURT:  All right.  Good afternoon, Mr. Bell, and

13   good afternoon, Ms. Rivas.

14          Let me begin with the government.  This is our initial

15   conference in the case.  Can you begin just by giving me the

16   dates of the return of the indictment and the defendant's

17   arraignment?

18          MS. SASSOON:  I apologize, your Honor.  I was so

19   focused on bail, I actually have to pull that up.

20          THE COURT:  We'll get to bail, but I'm going to put

21   that towards the back end.

22          MS. SASSOON:  The defendant was arraigned on

23   August 14th, that was Wednesday of last week, and the

24   indictment was returned several weeks before because the

25   defendant was transported from Virginia, where she was

1   arrested.

2          THE COURT:  And there was no complaint in the case,

3   correct?

4          MS. SASSOON:  There was no complaint, and I can

5   provide your Honor with the exact date.  July 23rd.

6          THE COURT:  All right.  I assume time was excluded as

7   of the point of the arraignment?

8          MS. SASSOON:  Yes, your Honor.

9          THE COURT:  Because there's no complaint here, the

10  speedy trial clock begins to run with the arraignment, as

11  opposed to the arrest?

12         MS. SASSOON:  That's correct, your Honor.

13         THE COURT:  I think that's right.  All right.  Very

14  good.  Tell me about the charges in the case.

15         MS. SASSOON:  Yes, your Honor.  The defendant is

16  charged in one count with conspiracy to commit extortion in

17  violation of 18, U.S.C., Section 1951, and I can describe

18  what's in the indictment, as well as the types of evidence that

19  would be produced in the discovery, if that would be helpful.

20         THE COURT:  I will get to discovery in a moment.

21  Right now, I just want to understand what the allegations are

22  as to what happened.

23         MS. SASSOON:  Yes, your Honor.  The allegation is that

24  the defendant was a high-ranking member within MS-13, and that

25  as part of her role within that organization, she extorted

J8MPRIVC

other members of that organization through the collection of

dues for the enterprise. And in the course of that, there were

threats of violence and actual infliction of violence for the

failure to pay dues.

THE COURT: And when you say she is a high-ranking

member and that she extorted other members for dues, can you

unpack that a little more?

MS. SASSOON: Yes, your Honor. So MS-13 is an

enterprise that operates in El Salvador and the United States,

among other places. It's a violent gang that engages in

murder, assault, narcotics trafficking, and firearms

trafficking, among other crimes.

Within the United States, the organization is divided

into a number of programs, also known as "cliques," and among

those cliques is a click named Hollywood Los Salvatrucha, which

for short is HLS.

THE COURT: Yes, I noted that.

MS. SASSOON: Within that particular clique, the

defendant, at a certain point, became what's called the "first

word," which is, in effect, a manager of that clique, and in

managing that clique, the defendant was actually in charge of

MS-13 HLS members throughout the United States and, in

particular, on the eastern seaboard within a number of states,

including Virginia, Maryland, New York, Washington, D.C., among

other places.

1          In that role as a clique leader, among other things,

2     the defendant was responsible for extorting dues but also

3     directing certain gang activity, coordinating, for example,

4     shipment of firearms and narcotics, approving acts of violence

5     and actually transmitting dues to other MS-13 members,

6     including those in El Salvador and in prison.

7          THE COURT:  Did Ms. Rivas participate in acts of

8     violence herself, to your knowledge?

9          MS. SASSOON:  She has directed acts of violence, but

10    not herself engaged in violence, as far as we know.

11         THE COURT:  All right.  I imagine we'll get into a

12    little more detail when it comes to bail, but that's very

13    helpful for the purposes of understanding the case.  Tell me

14    about the rule 16 evidence.

15         MS. SASSOON:  Yes, your Honor.  So there's a variety

16    of evidence in this case.  Among other things, there was a

17    wiretap on Ms. Rivas' phone this year, between April and May.

18    Ms. Rivas was also intercepted on a wiretap of another MS-13

19    member's phone.  There have been a number of warrants executed

20    in this case including a GPS warrant, a search warrant on

21    Ms. Rivas' premises in June of this year, a search of her cell

22    phone resulting from that premises search warrant and also on

23    her consent, an iCloud search warrant.

24         Following the premises search warrant in June,

25    Ms. Rivas made a noncustodial statement to law enforcement, and

1    there are also a number of subpoena returns in this case, most

2    notably, Western Union and MoneyGram records showing money

3    transfers by Ms. Rivas to other members of the MS-13.

4            THE COURT:  Just in terms of the rule 16 volume,

5    you've identified a number of means of data collection.

6    Wiretaps sounds like potentially the most bulky.  How

7    voluminous are the returns on the wiretap?

8            MS. SASSOON:  Your Honor, Ms. Rivas' phone was

9    intercepted for 30 days, and there were calls throughout that

10   period.

11           THE COURT:  All right.  Are there line sheets?

12           MS. SASSOON:  Yes, your Honor.

13           THE COURT:  All right.  What about the search of her

14   home, what sort of fruits do we have there?

15           MS. SASSOON:  The primary fruits are what came off her

16   cell phone, but documents were also seized in the course of

17   that search.

18           THE COURT:  All right.  How long until you can produce

19   rule 16 discovery to the defense?

20           MS. SASSOON:  Three weeks, ideally, and we can produce

21   on a rolling basis.

22           THE COURT:  All right.  As you know, just having had

23   prior cases before me, at the initial conference, in addition

24   to identifying the scope of rule 16, which you've done, I'm

25   eager to understand what, if any, Fourth or Fifth Amendment or

1    Sixth Amendment events have been used, and you've already, I

2    think, largely touched on that.

3         The reason I want to break it out is so that Mr. Bell

4    is on notice of at least potential areas for suppression

5    motions so that I can direct that at a second conference, he

6    let us know what suppression motions he might be making.

7    Hearing you speak, I pick up the Title III?

8         MS. SASSOON:  Yes, your Honor.

9         THE COURT:  The home search, which was pursuant to a

10   warrant.  There is, I take it, a separate Title III of a

11   different MS-13 member?

12        MS. SASSOON:  Yes, your Honor.

13        THE COURT:  There is the cell phone search, which was

14   pursuant to a warrant or consent to --

15        MS. SASSOON:  Yes.

16        THE COURT:  -- or both?

17        MS. SASSOON:  So within the premises search warrant,

18   there was language about searching any electronic evidence

19   seized in the course of that search.  The phone was seized in

20   the course of that search.  In addition, Ms. Rivas provided her

21   consent to search that home.

22        THE COURT:  I see.  But you've got alternative --

23        MS. SASSOON:  Yes.

24        THE COURT:  -- legal bases for the search?

25        MS. SASSOON:  Yes, your Honor.

J8MPRIVC

1          THE COURT:  There's a cloud warrant, but also that's a

2     warrant?

3          MS. SASSOON:  Yes.

4          THE COURT:  Are there any warrantless searches in the

5     case?

6          MS. SASSOON:  Not that I can think of, your Honor.

7          THE COURT:  Okay.  And you mentioned, as well, a

8     statement that the defendant made.  Was that post-arrest or

9     pre-arrest?

10          MS. SASSOON:  So this was in the course of the

11     premises search warrant.  The defendant voluntarily went to a

12     local police station and was interviewed by agents.  It's our

13     position that that was a noncustodial interview, but in

14     addition, Ms. Rivas was Mirandized and waived her Miranda

15     rights.

16          THE COURT:  I see.  Okay.  So in other words, your

17     view is that it's not custodial because on her own dime she

18     decided to go to a local police station?

19          MS. SASSOON:  Yes.

20          THE COURT:  But even if it was, Miranda rights were

21     given.  Is that statement memorialized on video?

22          MS. SASSOON:  It is.

23          THE COURT:  Okay.  So you've reviewed that, and from

24     your perspective, the Miranda warning is given properly?

25          MS. SASSOON:  Yes.

J8MPRIVC

1            THE COURT:  Any other searches or seizures or

2    statements?

3            MS. SASSOON:  Yes.  The agents involved in this case

4    did speak with Ms. Rivas several months before the premises

5    search warrant, to give her notice of certain obligations if

6    one is to act as a money remitter.  That was documented in

7    photographs and also a recording.  I don't know that we would

8    intend to introduce that, but it will be part of the discovery.

9            THE COURT:  But that's a statement made in a

10   noncustodial context, I take it?

11           MS. SASSOON:  Yes, your Honor.

12           THE COURT:  Okay.  I just want to make sure we've

13   covered now all the rule 16, at least that is that you can

14   presently recall.

15           MS. SASSOON:  In addition, there might be some law

16   enforcement reports related to prior encounters the defendant

17   has had with law enforcement.

18           MR. BELL:  I missed that last part, I'm sorry.  Prior?

19           MS. SASSOON:  Encounters she has had with law

20   enforcement.

21           THE COURT:  Are you able to elaborate on that?

22           MS. SASSOON:  Yes.  And I can also elaborate during

23   the bail argument, but the defendant has previously made

24   statements to law enforcement.  For example, in 2011, she was

25   present when a boyfriend, who was an MS-13 member, was

J8MPRIVC

arrested, and she made a statement to law enforcement about

knowing that the boyfriend was a member of MS-13.

In 2014, she was the get-away driver, after a shooting

committed by several MS-13 members, and I believe she was

arrested.

THE COURT: Arrested, but not charged thereafter?

MS. SASSOON: Correct.

THE COURT: Okay.

MS. SASSOON: In addition, as my colleague has pointed

out, we'll also be producing some cell phone contents recovered

from another MS-13 member's phone that will include

communications with Ms. Rivas, as well as communications about

Ms. Rivas.

THE COURT: Okay. Do you have a current estimate of

the length of the trial?

MS. SASSOON: Your Honor, we expect that we will be

superseding in this case. As you might have picked up on, the

indictment has the flavor of a RICO indictment, and we

anticipate superseding with racketeering charges.

THE COURT: Do you expect to be superseding with

substantive counts keyed to specific incidents? Right now, I

see that it's an extortion conspiracy, but it sounds as if,

from some of the evidence you've proffered, you've got

particular incidents in mind.

MS. SASSOON: Yes, your Honor. In addition to

J8MPRIVC

1  extortion predicates, we expect to include additional

2  predicates that involve violence, including murders committed

3  by MS-13, not by this particular defendant, but as part of HLS

4  activity.

5          THE COURT:  Well --

6          MS. SASSOON:  Even if --

7          THE COURT:  If the superseder is -- I'm not expecting

8  you to name anybody else, but as it relates to this defendant,

9  if there's a superseder as to her, how does the murder connect

10  to her?

11          MS. SASSOON:  It's activity of the enterprise.

12          THE COURT:  But is it activity that in any way she is

13  connected to?

14          MR. SCOTTEN:  So I expect, your Honor, that any

15  racketeering indictment is going to include the sentencing

16  enhancement, increasing 20 years to life because, as part of

17  joining MS-13, Ms. Rivas would have agreed that murders are

18  committed by other members of the enterprise.

19          And as part of that, we'll probably prove up, briefly,

20  a couple of murders committed by the clique.  We don't expect

21  to prove any direct connection between the defendant and the

22  murders.  We're not going to suggest she ordered them, aided

23  and abetted them.  I don't think there will be a substantive

24  by-card.  I do think there will be some proof of these various

25  predicates.

1      THE COURT:  The point is that you would be charging

2  that she participated in the enterprise, aware of its broader

3  objectives, one of which was murder, and there is a sentencing

4  enhancement consequence to that in elevating the available

5  ceiling if a jury were to so find beyond a reasonable doubt?

6      MR. SCOTTEN:  Exactly, your Honor.  So as to establish

7  that sentencing enhancement, I expect there will be some proof

8  of murders but nothing like a murder trial.

9      THE COURT:  Understood.  All right.  So with that

10 preface, Ms. Sassoon, how long do you think a trial, ballpark,

11 would likely be?

12     MS. SASSOON:  About two weeks.

13     THE COURT:  Thank you.  All right.  Very helpful.

14 Anything else you want to put on the table before I turn to

15 Mr. Bell?

16     MS. SASSOON:  Not at this time, your Honor.

17     THE COURT:  All right.  Mr. Bell, I understand there

18 will be a bail application.  Put that off for a moment, and

19 let's just talk about the progress of the case.  You've now

20 gotten a preview from the government of the nature and some

21 sense, perhaps, of the scope of the rule 16 material.

22     You've also gotten a sense of at least the potential

23 direction of the superseder, and the government has helpfully

24 identified certain law enforcement events that, by their

25 nature, sometimes lead to suppression motions.  Although, I do

J8MPRIVC

1  note that it sounds like all the searches and seizures here are

2  warranted, meaning pursuant to a warrant.

3        Any perspective on when you would want a next

4  conference?  Anything else that I should be mindful of, from

5  your perspective, putting aside bail?

6        MR. BELL:  If you're asking me how much time I would

7  need, Judge, I guess it would just depend on the accuracy of

8  the voluminousness of this material and the like.

9        As you imagine, even for a 30-day period of time, the

10  idea of wiretaps could take, you know, substantial time to go

11  through, even with the aid of line sheets, and that's just one

12  sort of thing.  I would suggest, at a minimum, four months --

13  three, four months to sort of get myself into it, potentially

14  get, you know, assistance by way of a paralegal and the like to

15  help go through and chart some of these things.

16        I imagine, based on what they're saying, that there is

17  this other issue of a superseding indictment, whether that's

18  going to come sooner versus later and how that could, of

19  course, effect things.  But if the Court is asking me now, with

20  what I have, I would imagine 90 days, on the short end.  I

21  understand the Court's position, being in front of the Court on

22  some of these matters, but it seems like what they have laid

23  out, especially for a one-defendant matter, is substantial.

24        THE COURT:  I would want to make sure at a next

25  conference in the case, to the extent that the government has

1   identified searches and seizures, the wiretap and the like,

2   that you are in a position to tell me whether you intend to

3   move to suppress.  I wouldn't expect you to be moving then and

4   there, but that at that next conference, I would want you to

5   commit to any suppression motions such that if I determined to

6   have that litigated early, you would then be in a position

7   promptly thereafter to move.

8        I take it what you're saying is if I scheduled a

9   conference in three months from now, that would be November,

10  you would then be in a position to make that commitment?

11       MR. BELL:  That would be my hope, Judge.  As the Court

12  knows, when we start getting into these things, whether it's

13  readily available, whether or not there's any technical issues

14  and the like, all of those unforeseen issues --

15       THE COURT:  Subject to unforeseen issues, based on

16  what Ms. Sassoon has proffered, it seems to me more than

17  reasonable to expect you to be in a position to make a

18  determination as to whether you're moving to suppress within

19  three months.

20       MR. BELL:  I don't believe that's unreasonable, Judge.

21       THE COURT:  All right.  Look, it seems to me under the

22  circumstances here, there is value, in addition to setting the

23  next conference date, in setting a trial date so that we are

24  all on the same page and everyone can plan accordingly.

25       Ms. Sassoon, just as I think about that, approximately

J8MPRIVC

1    when do you think you might be intending to supersede by?

2            MS. SASSOON:  Your Honor, with the caveat that any

3    decision or memo has to be reviewed by DC and we're subject to

4    their timeline with a racketeering memo, about 30 days.

5            THE COURT:  All right.  Let me throw out directionally

6    the following, which would be to schedule this for trial in

7    early February, which is, more or less, about six months or a

8    tiny bit under from now, and with an aim of having a conference

9    in November.  Directionally putting aside specific dates,

10   Mr. Bell, does that make sense?

11           MR. BELL:  Early November works best for me as, of

12   course, the Court is well aware of the holidays and travel.

13           THE COURT:  We'll haggle about dates in a moment.

14   Directionally, does that give you the time you need to take

15   stock of the case?

16           MR. BELL:  Outside of what the Court already knows as

17   my caveats, I think that's fine, your Honor.

18           THE COURT:  The idea of a trial in, let's say, early

19   February?  I mean, your client, putting aside whatever happens

20   in bail, your client has a liberty interest, whether it is in

21   the form of her having been detained or her having been

22   released, subject to the formidable conditions that you're

23   describing, one way or the other, your client has a speedy

24   trial interest here.

25           MR. BELL:  I absolutely understand that, Judge.  I

would say, standing here, that sounds reasonable, but as the

Court is well aware, you know, when we get into these things,

more time is generally requested due to facts or circumstances.

I was thinking a March, April date, but that's what I

was thinking as I'm going through this and I'm looking at my

other commitments and the like.  I was thinking a little bit

further into the beginning of the year, my thoughts.

THE COURT:  All right.  Look, my inclination,

Mr. Bell, is to set this down for trial for early February.  I

think you've got five-and-a-half months.  I would be happy for

you to seek authorization, and I will happily grant it, for a

paralegal.  Given Ms. Sassoon's proffer as to the volume of

discovery material here, it seems to me more than worthwhile,

but it doesn't seem to me that it's a case where the volume

here suggests a need to put this over any longer than that.

Before I commit to a date, government, is there any

reason why a trial date beginning in early February is

unrealistic?

MS. SASSOON:  No, your Honor, not from the

government's perspective.  No.

THE COURT:  Okay.  Mr. Bell, I'm going to put this

down for trial for February 3rd, and I expect you to work

towards the trial date and treat that as a firm date.

Obviously, in the event of a superseding indictment

that exceeds what Ms. Sassoon is projecting now, I would have

J8MPRIVC

1   to reassess, but she has given all of us some notice as to the

2   likely direction of a superseder.

3        And, Ms. Sassoon, I think in the interest of

4   sustaining the trial date, I would suggest that as you get a

5   better sense of particularly acts that are likely to form the

6   basis of the superseder if you could give written informal

7   notice to Mr. Bell of that, you would be serving the

8   government's interests well in giving Mr. Bell more time to

9   prepare to meet those.

10       In other words, notwithstanding the fact that you have

11  an application pending at DOJ, I encourage you but don't

12  require you, to give notice to Mr. Bell of particular acts or

13  areas that the superseder would touch upon that will help him

14  focus his activity.

15       MS. SASSOON:  Yes, your Honor.

16       THE COURT:  Look, I'm mindful that there could be a

17  variety of reasons why various, legitimate government interests

18  would be undermined by giving that form of notice, and that's

19  why I'm not requiring it, but I'm encouraging you to do it in

20  your judgment so that, hopefully, we can preserve the trial

21  date.

22       MS. SASSOON:  Yes.

23       THE COURT:  All right.  So let's put the case down for

24  trial for February the -- yes, Mr. Bell?

25       MR. BELL:  My only other sort of point is that it

1  appears that what the government is saying is that they could

2  start getting me discovery in three to four months --

3          THE COURT:  No, no, no.

4          MR. BELL:  -- three to four weeks --

5          THE COURT:  Ms. Sassoon expects to complete the

6  process of getting you discovery within three weeks, but will

7  be providing it on a rolling basis.  Did I get that right,

8  Ms. Sassoon?

9          MS. SASSOON:  Yes.

10          THE COURT:  That strikes me, given the volume here, as

11  entirely realistic.

12          MR. BELL:  Okay, Judge.

13          THE COURT:  Okay.  Ms. Sassoon, I will encourage you,

14  as I do in all cases, to the extent that there is a volume here

15  that is somewhat harder here for a defense counsel to make

16  sense of, it strikes me that, to the extent that you're able to

17  helpfully direct defense counsel within, if there's a

18  substantial mass, materials that the government regards as

19  particularly salient, that would be useful.

20          I don't know, for example, in the context of the

21  wiretap of the other person, to what degree the fruits of that

22  wiretap are relevant to this defendant and to what degree they

23  may be extraneous.  But, for example, to the extent to which

24  you can isolate the calls on that other defendant's wiretap

25  that strikes you as consequential, I think that would be well

1    worthwhile.

2               MS. SASSOON:  Okay, your Honor.

3               THE COURT:  Okay.  All right.  For a next conference,

4    how about Thursday, November the 21st?

5               MR. BELL:  May I check my calendar?

6               THE COURT:  Of course.

7               MR. BELL:  That's fine for defense.

8               THE COURT:  10:00 a.m.?

9               MS. SASSOON:  Yes.

10              THE COURT:  All right.  I'm going to put the next

11   conference down for that date.

12              Mr. Bell, in the event your client is the subject of a

13   superseder between now and then, I expect I will bring you in

14   to arraign your client on the superseder and, frankly, just to

15   make sure that there aren't any hiccups that have developed

16   with respect to the provision of discovery or to make sure that

17   we're on a good track with respect to the provision of

18   discovery unique to the new charges.

19              But in any event, we're on for November the 21st at

20   10:00 a.m.  You are on notice, Mr. Bell, that at that

21   conference, I will be asking you what, if any, motions to

22   suppress the defense intends to make.  That would include not

23   just search and seizures under the Fourth Amendment, but any

24   challenge to either the wiretaps, any motion to suppress

25   statements.

J8MPRIVC

1          Ms. Sassoon, I take it there are no lineups or

2     show-ups or identification procedures that you're aware of in

3     this case?

4          MS. SASSOON:  No, your Honor.

5          THE COURT:  All right.  You will need to tell me then

6     whether you intend to so move.  If you do, I will then set a

7     schedule keyed to what I'm learning about the case that makes

8     sense.  It could well be, though, that I would be directing you

9     to file within two weeks of that date; so just be mindful of

10    that, Mr. Bell.  You need to do your homework, in other words,

11    as to suppression by then.  If you haven't identified a

12    suppression motion based on a search or seizure disclosed in

13    initial discovery as of 11-21, you will be taken as waiving

14    that right.

15         MR. BELL:  Understood, Judge.

16         THE COURT:  Understood.  All right.  Very good.  Is

17    there anything -- let's just take care of this exclusion of

18    time, and then we'll get to bail.

19         Is there an application for the exclusion of time?

20         MS. SASSOON:  Yes, your Honor.  The government moves

21    to exclude time in the interest of justice so that we may

22    prepare and produce discovery, defense counsel may contemplate

23    potential motions, and we can discuss a potential disposition

24    of the case.  We'd move to exclude until the February 3rd trial

25    date.

J8MPRIVC

1          THE COURT:  Mr. Bell, any objection?

2          MR. BELL:  No, Judge.

3          THE COURT:  All right.  I will exclude the time

4    between now and the trial date, and I do so for these reasons.

5    This is a case with very serious charges and with a diverse and

6    seemingly substantial quantity of evidence.  It's important

7    that Mr. Bell have the freedom and opportunity to review the

8    discovery both to prepare for trial, to assist him in

9    negotiating with the government towards any potential

10   disposition, and to identify potential pretrial motions, such

11   as suppression motions.

12         The exclusion of time is undertaken and is proper here

13   to give the defense the opportunity to work its way through

14   that material and make some of the strategic judgments and

15   assessments that defense counsel needs to make.

16         I would note, as well, that in the ordinary course, it

17   is customary that there is likely to be some discussion about a

18   potential disposition.  I don't know the likelihood that it

19   will occur here, but the exclusion of time is to facilitate

20   that, as well.

21         So for all those reasons, separately and together, I

22   find that the interests of justice outweigh the interest of the

23   defense and the public in a speedy trial.  I, therefore,

24   exclude time between now and February 3rd, pursuant to Title

25   18, United States Code, Section 3161(h)(7)(A).

J8MPRIVC

1        Ms. Sassoon, is there anything further besides bail?

2        MS. SASSOON:  No, your Honor.

3        THE COURT:  Mr. Bell, anything besides bail?

4        MR. BELL:  No, Judge.

5        THE COURT:  All right.  So, Ms. Sassoon, as I

6   understand it, the defendant was detained on consent by Judge

7   Pitman, but there wasn't a substantive argument about bail.

8        MS. SASSOON:  That's correct.

9        THE COURT:  What is the government's position?

10        MS. SASSOON:  The government is seeking detention

11   based on both risk of flight and dangerousness.

12        THE COURT:  Okay.  Go ahead tell me why.

13        MS. SASSOON:  Your Honor, I'll walk through the bail

14   factors for the Court to consider, and I think it makes sense

15   to discuss the nature and circumstances of the offense, along

16   with the weight of the evidence together.

17        THE COURT:  May I just ask you, is this a presumption

18   case?

19        MS. SASSOON:  It is not.

20        THE COURT:  So the burden is on the government?

21        MS. SASSOON:  That's correct.

22        THE COURT:  And by clear and convincing evidence as to

23   the danger component?

24        MS. SASSOON:  Correct.

25        I've already touched on some of the types of evidence

1    in this case, but I'd like to discuss in more detail the nature

2    of that evidence and the seriousness of the conduct here.

3            As I've mentioned, the evidence in this case includes

4    subpoena returns showing wire transfers, and what those records

5    show is that for at least five years, the defendant has been

6    engaged in transferring money on behalf of MS-13, collecting

7    dues and transmitting them to members of the gang in

8    El Salvador and in prison and in order to support the gang's

9    activities.  And she has engaged in hundreds of transactions in

10   the tens of thousands of dollars.

11           Now, that money is being used in the service of a very

12   violent, dangerous organization, and I've discussed some of the

13   Rule 16 evidence that will establish Ms. Rivas' involvement in

14   MS-13, but we also have witness testimony in this case that

15   will establish how this money is collected and to what ends it

16   is being used.

17           As alleged in the indictment, this gang is involved in

18   murder, in narcotics trafficking, and the use of firearms.  And

19   as part of our broader investigation, we have actually solved

20   multiple murders in other districts, recovered bodies and

21   recovered firearms that are all connected to the gang, of which

22   Ms. Rivas is a leader.

23           As a leader within that gang, Ms. Rivas was

24   responsible for extorting dues from its members, and our

25   evidence, including the witness testimony, will establish that

1    there were established rules within the gang about payment of

2    dues, including the understanding that if dues were not paid,

3    it would result in physical violence and that, in fact,

4    physical violence did result when dues were not paid and that

5    those directives of violence would come from leaders like

6    Ms. Rivas.

7            In addition to the direct pressure for the extortion

8    of dues, was the understanding of gang members that if they

9    tried to withdraw and to leave this gang that included the

10   extortion of dues, that they would be greenlit to be murdered,

11   and that those types of directives, again, came from leaders

12   within the gang.

13           As a clique leader, Ms. Rivas was responsible for

14   collecting dues from lower-ranking members of the gang, and she

15   also was in active communication with the leadership of the

16   gang in El Salvador.  And Ms. Rivas was not only overseeing

17   this extortion locally, but she was known across the eastern

18   seaboard as the clique leader and as what's called, as I

19   mentioned, the "first word" within HLS.

20           In addition to extorting dues with the threat of

21   violence, our testimony and evidence will establish that, among

22   other things, the defendant expected members to come up with

23   the money for dues through criminal activity that was common to

24   the gang, such as narcotics trafficking and the trafficking of

25   firearms, and that in addition to her role in collecting money,

J8MPRIVC

 1    she also coordinated narcotics trafficking and firearms

 2    trafficking.

 3         As I mentioned, in addition to the current charges,

 4    the government also expects to be bringing even more serious

 5    charges against Ms. Rivas, including a racketeering charge, but

 6    as it stands, the current extortion count -- well, extortion

 7    always involves threats of violence.  Like I said, that threat

 8    here is very significant and involved actual violence, which

 9    would mean that her guidelines here are significant and that

10    she's facing real jail time.

11         THE COURT:  Do you expect to supersede with a firearms

12    count or a narcotics count?

13         MS. SASSOON:  Perhaps as a predicate.  In light of

14    Davis, we don't expect to be superseding with a -- I don't want

15    to rule it out, but I'm not promising that.

16         THE COURT:  Well, you mentioned narcotics, right?  Do

17    you expect to be superseding with a narcotics charge?

18         MS. SASSOON:  It's certainly a predicate of the

19    racketeering enterprise, but I'm not sure it would be an

20    independent count.

21         THE COURT:  In other words, right now, you're not

22    looking at substantive counts for this defendant that sound in

23    narcotics or firearms, even if those are predicate acts of

24    MS-13?

25         MS. SASSOON:  Based on the evidence that we have, she

1  has been directly involved in narcotics transactions and

2  facilitating the trafficking of firearms, but the weight of

3  those transactions, as we understand them today, is not enough

4  to likely justify a separate count.

5        THE COURT:  Let me ask you.  I noted that she was

6  arrested in Virginia, and I'm mindful, just as a member of the

7  public, that many of the MS-13 cases, I think, have been

8  brought in the Eastern District.  What connects this case to

9  this district?

10        MS. SASSOON:  Yes, your Honor.  As I mentioned, she

11  was a leader across the eastern seaboard, and that would

12  include Maryland, Virginia, Washington, D.C. and New York.  In

13  New York, the primary MS-13 activity is in the Eastern

14  District, but our evidence will establish travel through the

15  Southern District for purposes of her activities.

16        THE COURT:  So that would establish the venue with

17  respect to the charge that's been brought, but does that limit

18  some of what you can bring in terms of other charges against

19  her, the need for a Southern District nexus?

20        MS. SASSOON:  Not with respect to racketeering.

21        THE COURT:  Okay.  All right.  Tell me -- Go ahead.

22  Go ahead.

23        MS. SASSOON:  Going back to the nature of the evidence

24  and the weight of that evidence, I've mentioned things such as

25  a search of Ms. Rivas' iPhone, and I'd just like to give a

1  couple examples of the evidence recovered there.  Her phone

2  establishes both the transfer of money, there are receipts of

3  wire transfers on MoneyGram and Western Union to known MS-13

4  members and to El Salvador.  There was a photograph, for

5  example, of an AK-47 and I have that --

6          THE COURT:  On her phone?

7          MS. SASSOON:  Yes, and that was served in June of

8  2019; so extremely recently.  I have a copy of that photograph.

9          THE COURT:  Can you hand it up?  I'd like to see it.

10          MS. SASSOON:  Another photograph I have a copy of is a

11  photo of the HLS flag, which was on her phone, and this is just

12  one example of the evidence on her phone tieing her to the

13  clique.

14          And on Ms. Rivas' phone, and on the phone of another

15  MS-13 member that was searched in this case, there are chats

16  about dues, about violence in service of the gang.  There are

17  references to Ms. Rivas, who's also known as "Grumpy," being a

18  member of the gang, coordinating collection of dues, and as I

19  mentioned, access to guns and to drugs.

20          THE COURT:  So to the extent that we're talking about

21  danger to the community, I'd welcome your saying what you can

22  that ties her to the facilitation, even indirectly, of

23  violence.

24          MS. SASSOON:  Yes, your Honor.  So, first of all,

25  these dues are being collected in the service of the activities

J8MPRIVC

 1   of an organization that's involved in murder and assault, in

 2   firearms trafficking.  And this money is being distributed to

 3   El Salvador, where extreme violence of MS-13 takes place, and

 4   to MS-13 members who are incarcerated on serious charges,

 5   including RICO connected to MS-13.

 6        Often these people she's sending money to are

 7   self-identified members of MS-13, who have arrived in prison

 8   and identified themselves as MS-13.  And she's communicating

 9   directly with them to coordinate these payments, and so she is

10   the coordinator of this entire clique, to collect the money to

11   service these activities of the gang.

12        In addition, as I said, in the collection of dues,

13   she's able to enforce that through threats of violence and

14   actual violence.  We'll have evidence of individuals in the

15   gang being assaulted for failure to pay dues at the direction

16   of Ms. Rivas.

17        As I mentioned, there's a photograph of a firearm on

18   her phone, and in terms of danger to the community, which was

19   something I was -- and the seriousness of the danger here,

20   which is actually another factor for the bail considerations,

21   there's a particular danger here because she is a leader within

22   the organization who has been able to facilitate the activities

23   of the gang from the comfort of her own home, and to evade

24   detection by law enforcement precisely because that's how she

25   carries out the activities of the gang.

J8MPRIVC

          THE COURT:  The Title III that was on her phone, was

that a cell phone or a land line?

          MS. SASSOON:  A cell phone.

          THE COURT:  And could you tell whether she was largely

making calls out of or around her home while she was on that

phone?

          MS. SASSOON:  No, your Honor.  We do have -- wiretap

information comes with GPS data, but I don't know that it's

been analyzed for that.

          THE COURT:  Let me rephrase it.  Was she in and around

the Virginia area --

          MS. SASSOON:  Yes.

          THE COURT:  -- during the time of the wiretap?

          MS. SASSOON:  Yes.

          THE COURT:  And broadly, can you characterize the sort

of activities that the wiretap showed her to be involved in?

Because that's pretty fresh.

          MS. SASSOON:  Communications with other MS-13 members,

her conversations, frankly, were relatively guarded.  As we

learned from the search of her cell phone, one of her preferred

methods of communications was WhatsApp, which we increasingly

see in these sophisticated gang investigations because it's

harder to monitor WhatsApp communications.  So on the phone,

she was somewhat careful, but there were discussions with other

MS-13 members that we understood to be about gang meetings and

1      about dues.

2              And on that front, there is case law in this circuit

3      about how if a court determines that someone presents a danger

4      to the community, if they are a leader of an organization

5      that's engaged in activity like extortion, like violence and

6      murder, that bail conditions are unlikely to satisfy the need

7      to assure safety to the community precisely because they're

8      operating out of their home and have the ability to communicate

9      with lower-ranking members who can carry out directives.

10             And of particular concern in this case is the safety

11     of witnesses and other members of MS-13 who are cooperating

12     with law enforcement.  In the course of this investigation,

13     among other things, we've learned that there is serious

14     retaliation taken against suspected snitches and even murder

15     carried out against suspected snitches.

16             THE COURT:  Tell me about that.  I mean, by now,

17     there's a significant body of MS-13 cases.  Tell me about the

18     pattern of retaliation against the perceived witnesses and the

19     like in those cases.

20             MS. SASSOON:  So my understanding, just generally,

21     about MS-13 is there's a culture of if you snitch or even if

22     you try to withdraw from the gang, you're greenlit for murder.

23             With respect to this particular defendant, there are

24     chats that we've seen about snitches, and most concerning, and

25     this is actually something I don't think any of us have seen in

J8MPRIVC

1  any prior case, in the search of the phones we found a

2  screenshot sent to Ms. Rivas by another MS-13 member that was a

3  screenshot of notes from a proffer that took place in another

4  federal district with an MS-13 cooperator; so actual notes from

5  a meeting with the government, exposing this person as a

6  cooperator.

7        THE COURT:  May I ask you, and I'm not asking for any

8  answer that would compromise any law enforcement interest.  Any

9  theory as to how the notes from a proffer got out?  Were they

10  part of Jencks Act material?

11        MR. SCOTTEN:  So, your Honor, not Jencks Act material.

12  This was a cooperator who -- our first knowledge that he was a

13  known MS-13 cooperator was finding these proffer notes on the

14  phone.  He has not testified, material has not been turned over

15  anywhere.

16        THE COURT:  Right.

17        MR. SCOTTEN:  Because it comes from another district,

18  we haven't been the ones investigating how it made its way onto

19  Ms. Rivas' phone.  I can back it off --

20        THE COURT:  But apparently, there's been no public

21  acknowledgment of this person's, A, cooperation; and, B,

22  specific proffer and, yet, it's on the phone.

23        MR. SCOTTEN:  Correct.  I can trace it back one step.

24  We know the person who sent the notes to Ms. Rivas is a leader

25  of an associated MS-13 clique.  His real name is Andy Tovar.

He goes by "Fearless."  We had a wiretap on his phone recently, which ended when we arrested him for a shooting.  He's, himself, been involved in multiple murders; so he somehow got these notes and sent them to Ms. Rivas.  How Mr. Tovar came across these notes, we don't know.

THE COURT:  Okay.  Thank you.  Very helpful.

MS. SASSOON:  Just to pick up where he left off, that's just one example of an MS-13 member, who Ms. Rivas is in direct communication with, someone who has been involved in murders and non-fatal shootings and who is reporting to Ms. Rivas about a potential cooperator.

THE COURT:  You've mentioned a number of times her being a leader in the gang.  How do we know that?

MS. SASSOON:  Both through some of the Rule 16 evidence that I've discussed, chats where other people are talking about her role within the gang, witness testimony from a variety of different MS-13 members who operate in different parts of the country identifying her as a leader of HLS; so in a variety of ways.

And it's our understanding, too, of MS-13 that one of the roles of a leader is the collection and transmission of dues, which is established here.

THE COURT:  All right.

MS. SASSOON:  I do want to address any questions your Honor has, but I also I have not addressed the factor of the

1   history and characteristics of this particular defendant, and

2   that was emphasized in Mr. Bell's submission, the lack of a

3   criminal history, that the defendant is a woman with a child.

4           And I think, here, the lack of criminal record, in a

5   way, cuts the other way, which is Ms. Rivas has been operating

6   as part of MS-13 for the better part a decade, and we know

7   that based on information from confidential sources, her

8   encounters with law enforcement, the number of years that she

9   has been engaging in these wire transfers and so --

10          THE COURT:  Wire transfers go back how far?

11          MS. SASSOON:  To 2014.

12          THE COURT:  And since a wire transfer doesn't state

13  its purpose, how is it that you can take the older wire

14  transfers and draw the inference that it's in furtherance of

15  MS-13?

16          MS. SASSOON:  Yes, so we've been able to identify the

17  recipients of the transfers, and she's receiving and

18  transmitting money to these individuals.  Now, we haven't

19  identified the status of every person involved in a wire, but

20  some of the recipients are self-identified members of MS-13 in

21  prison.  Others have been identified as members of MS-13 based

22  on law enforcement information from a variety of sources,

23  including from El Salvador.

24          Now, so in addition to the wires, as I've touched

25  upon, she's had encounters with law enforcement dating back

J8MPRIVC

many years, and I'll just give two examples.  I mentioned that in 2011 she was present for the arrest of a known MS-13 member at his residence.  She identified as his girlfriend and acknowledged knowing about the gang and that her boyfriend was part of MS-13.

In 2014, a law enforcement officer witnessed a shooting in a parking lot by known MS-13 members.  He then stopped the car, and she was the driver, and ammunition and a firearm were recovered.

THE COURT:  But she wasn't arrested?

MS. SASSOON:  She was not ultimately charged.

In addition, the defendant has significant ties to El Salvador, which goes both to her dangerousness and to her risk of flight.  Like I said, she has direct communication with leaders of MS-13 who are located in El Salvador.  She lived there for a long period of time and, obviously, she maintains contacts there.  And given that she's been financially supporting people in El Salvador, she has the means to flee there.  She also has the means to flee out of this district because of all of her connections to different parts -- to different MS-13 groups around the country.

In addition, most recently, when she was interviewed at the police station in June following the premises search warrant, she was picked up by a car full of MS-13 members, and law enforcement was able to identify them as MS-13 because of

1    MS-13 tattoos that were visible.

2            If your Honor has any questions, I'm happy to address

3    them.

4            THE COURT:  Sure.  And let me just state for the

5    record, I noticed a second translator came in.  I forgot to

6    note for the record earlier that we've had a translator

7    throughout assisting Ms. Rivas in these hearings.

8            Mr. Bell, would you just confirm from Ms. Rivas that

9    she has been able to hear everything so far and understand?

10           MR. BELL:  She has, Judge.

11           THE COURT:  All right.  And, Ms. Rivas, let me just

12   say to you, going forward, if there's anything you don't hear

13   or can't understand, please get my attention so I can make sure

14   that it is repeated and adequately translated to you.  Okay?

15           THE DEFENDANT:  That's fine.

16           THE COURT:  Thank you.  Yes, just one question, I

17   guess.  Ms. Sassoon, you've seen the set of conditions that

18   Mr. Bell recommends.  Why would those be -- let's focus first

19   on flight.  Why would those be inadequate to reasonably assure

20   the defendant's appearance?

21           MS. SASSOON:  Yes.  So I mentioned some Second Circuit

22   case law.  I'd like to mention one case specifically.  It's

23   *United States v. Colombo*, that's 777 F.2d 96, it's a Second

24   Circuit case from 1985 that's been relied on by District Courts

25   in this district.

1          In that case, the defendant was the head of what was

2     called the Anthony Colombo Crew, which committed a variety of

3     state and federal crimes, many similar to those here, murder,

4     narcotics crimes, extortion and many others.  The district

5     found that the defendant was a danger to the community, but

6     bail conditions were appropriate, including an armed guard.

7          And there, the court said that even though the

8     defendant wasn't alleged to have participated in violence

9     himself, granting bail was clear error because those conditions

10    could not prevent him from, quote, establishing a base from

11    which he might direct criminal activity and would not, quote,

12    hinder the defendant's ability to supervise an illegal

13    enterprise.

14         And I think that case is directly on point here, where

15    the defendant is aware of the violent activity of the gang, has

16    herself directed violence, has connection to the gang

17    throughout the eastern seaboard.

18         THE COURT:  While she has, herself, directed violence,

19    give me the best example of that.

20         MS. SASSOON:  Yes.  Directing physical retaliation for

21    failing to pay dues.

22         THE COURT:  And how do you -- is that proven up

23    through witness testimony --

24         MS. SASSOON:  Yes.

25         THE COURT:  -- is it memorialized in writing?  Is it

1   both?

2           MS. SASSOON:  Witness testimony, your Honor.

3           THE COURT:  What was the sort of violence that ensued?

4           MS. SASSOON:  A violent beating.

5           THE COURT:  Okay.  All right.  Very good.  And same

6   question, same conditions as it relates to danger.

7           MS. SASSOON:  So that's danger, she can direct

8   activity both of the gang and potential retaliation.

9           And with respect to flight, even though she's

10  primarily operated out of Virginia, she has strong connections

11  throughout the country and to El Salvador, where she has

12  financially supported people in El Salvador, who presumably

13  have an incentive to help her, particularly if it would prevent

14  her from, you know, potential -- without knowing what could

15  happen to her case, they have an incentive to keeping her --

16          THE COURT:  To what degree are you finding, from the

17  materials that you've reviewed, that she's in touch with as-yet

18  unapprehended MS-13 members in the United States?

19          MS. SASSOON:  Yes.

20          THE COURT:  Like a lot?

21          MS. SASSOON:  Yes.

22          THE COURT:  And what about abroad?

23          MS. SASSOON:  Yes.

24          THE COURT:  All right.  Okay.  Thank you.  Very

25  helpful, Ms. Sassoon.

1          All right.  Mr. Bell, happy to hear from you.

2          MR. BELL:  Yes, Judge.  I mean, as I mentioned in my

3     letters to the Court, my client has never been arrested, never

4     been charged with any crime, never been alleged to have

5     participated in any crime.  My client does not have a passport.

6     My client has not left the United States in the better part of

7     15 years.

8          THE COURT:  She came to the United States when?

9          MR. BELL:  She was approximately 20 years old, Judge.

10          THE COURT:  And her citizenship is?

11          MR. BELL:  She was born here in the United States.

12          THE COURT:  She's what?

13          MR. BELL:  Born here in the United States.

14          THE COURT:  I'm sorry.  Born here in the United

15     States?

16          MR. BELL:  Yes, Plainfield, New Jersey, Judge.

17          THE COURT:  Yes, quite right.  Okay.  Thank you.

18          MR. BELL:  My client has, for the better part of ten

19     years, been gainfully employed.  She earned her certification

20     for medical assistant, has had -- since that time, has had two

21     gainfully -- been gainfully employed.  Even when she was

22     arrested, she was actually arrested at her job, where she was a

23     medical tech for a family practitioner for approximately five

24     years.

25          And even before that, she was working for -- she was a

student at Med Tech and was an employee at another -- one

moment -- Home Healthcare Incorporated, where she had worked

there for a number of years before that.

So the government has pointed to these allegations of

her either being associated and the like or transferring money.

What they failed to present is the idea that her family is from

El Salvador.  So she has a mother in El Salvador, who is

elderly, that she sends money to.

I have taken it upon myself to look through many of

the applications that she's had in the -- from Western Union

and the like.  It's my understanding looking at them, many of

those transfers are to her mother.  Outside of these transfers

to her mother, she has two younger brothers.  My client's

brother, who is in the courtroom, I've had many conversations

with him, which I've gone on to not only the Western Union, but

the MoneyGram application as well.

The two younger brothers, who are in El Salvador, who

are in school, she helps pay for their schools.  So when the

government is saying that there are people that she knows in

El Salvador, let's just say it.  You mean her mother?  You mean

her two brothers that are in El Salvador, which she sends money

to, for which are the people that the government has failed to,

of course, bring to the Court's attention.

So yes, does she send money to her family?  She does,

and there's records of that.  I would presume that the

1  information that the government will bear out what I already

2  know, Judge.

3          THE COURT:  May I ask you?  You haven't received Rule

4  16 evidence from the government; so you, apparently, have

5  access to her wire transfers through some other means?

6          MR. BELL:  Correct, Judge.

7          THE COURT:  If I may, what is that?

8          MR. BELL:  The Western Union, her online account for

9  Western Union and also MoneyGram.  Also, she gave me her

10  passwords to her bank accounts; so I've gone through all of

11  those means and have identified where money has come into her

12  account and where money is going out.

13          THE COURT:  How far back has your review gone?

14          MR. BELL:  I believe I haven't gotten back as far as

15  2013, because on her bank account, it allows you to download

16  transactions for the past seven years.

17          THE COURT:  So putting aside her mother and her two

18  younger brothers, what's the volume of wire transfers?

19          MR. BELL:  I'm in the process of putting all this

20  together.  You imagine, I was just assigned to this matter last

21  Wednesday.  Speaking to her and getting all of that, I have not

22  come up with an accurate -- at least as far as I can tell, an

23  accurate actual number, but I have seen that she has sent money

24  to her mother and her brother steadily for like --

25          THE COURT:  Right, but unless Ms. Sassoon says

J8MPRIVC

1    otherwise, that's not the -- those aren't presumably the wire

2    transfers that --

3         MR. BELL:  Well, she said people, Judge.

4         THE COURT:  I got that, but she's also describing wire

5    transfers that the government's evidence is relates to people

6    from MS-13.  So my question to you is when you look through the

7    wire transfers going back six years to 2013, are these

8    overwhelmingly to the mother and the brothers, or are you

9    seeing a not-incidental number of other wire transfers, even if

10    you can't explain them?

11         MR. BELL:  I am seeing people that I know, or what I'm

12    told are relatives of her's and/or close friends.

13         THE COURT:  Right, but what's leftover?  In other

14    words, I understand you're not, given the time you've been on

15    the case, been able to run to ground who lies behind the other

16    wire transfers.  I'm simply asking you, numerically, whether

17    there are, indeed, a bunch of wire transfers that aren't

18    identifiable to you as going to family?

19         MR. BELL:  It's sort of a Catch 22, Judge, because

20    you're asking me who are these people.  I haven't been able to

21    identify them.  What I do have seen --

22         THE COURT:  No, no.  I'm not trying to catch you in

23    anything, but the fact that she does some things that are

24    lawful --

25         MR. BELL:  Right.

J8MPRIVC

1          THE COURT:  -- is not the point here.  The issue is

2     the risk of her doing something or furthering something that is

3     unlawful.  And so insofar as I have the relatively rare

4     situation of a defense counsel, who has gotten his hands dirty

5     with wire transfers even before rule 16, I'm asking you whether

6     they show wire transfers that cannot be immediately identified

7     as mother and brothers?

8          MR. BELL:  And at that point, I can't say, Judge,

9     because I can't identify who these individuals are, whether or

10     not they're family, friends.  Because trying to get that

11     material inside the jail to have these conversations, I haven't

12     had enough time to do that.  I mean, the government appears to

13     have been in this investigation now for a substantial time.  I

14     haven't been there, but what I --

15          THE COURT:  So, look, with respect, I don't dispute

16     that she is supportive of people who, for the purpose of this

17     conversation, I will assume are not MS-13 members.  The issue,

18     though, is really not that.  It's the quality of the evidence

19     that she is supporting people who are MS-13 members.

20          The government has identified a host of contacts in

21     which it alleges she is in active communication with people

22     from MS-13.  She dated one who was arrested on her watch.  She

23     acknowledged he was MS-13.  Tell me about your client and

24     MS-13.

25          MR. BELL:  Judge, my client continues to deny that

she's a member of MS-13. Whether or not there's people in her

hemisphere, whether there's people in El Salvador that she may

or may not know, I haven't been able to identify that

information; so I can't say that one way or not to the Court.

        But what I do say, and which I think is somewhat

solidly found here is the fact that she has no criminal record,

Judge. She has not fled, nor has she made any attempts to

flee, when even after there was a search warrant of her home.

She was well aware and even reached out to counsel to help

resolve that matter in Virginia.

        So if she was, indeed, at that point, where she knew

that officers are coming to her house, agents were coming to

her house, if she wanted to flee, she would have fled back

then. My understanding is that the search warrant happened,

what -- happened in June of 2016 -- happened June 16th of this

year, Judge.

        So between June and when she was arrested, if she

wanted to flee, if this propensity of her wanting to flee, such

as the government is saying, she would have already done that,

but where did they catch her? At work. She went to work and

was arrested. She my understanding, after speaking with her

and speaking to her family, her primary concern has always been

her maintaining her relationship with her son. She had a

one-bedroom apartment --

        THE COURT: How old is the son?

1          MR. BELL:  He's in the courtroom, Judge.  He's 14.

2          So you have family members, who I've spoken to, family

3    in Virginia, family in Georgia, who are willing to sign the

4    bond.  Her father, who lives in Virginia -- excuse me, in

5    Georgia, is willing to sign the bond.  Her brother, who is in

6    court, who lives in -- who is in court today is willing to sign

7    the bond.  Her other older brother, who is a marine corporal in

8    the United States military, he is willing to sign the bond, as

9    well as another young woman, who has been friends with

10   Ms. Rivas for well over ten years.

11         So we have people who are gainfully employed, people

12   who will be able to substantiate where their income is coming

13   from, what their relationship is with Ms. Rivas, and be able

14   to, even in addition to that, be able to serve as a moral

15   suasion for Ms. Rivas as well.

16         So you have an individual of that character, who sits

17   before the Court and is now detained, and I believe there's

18   sufficient, in what I have here, presented to the Court as

19   conditions for her release.

20         Outside of that fact, Judge, the conditions that I

21   cited to the Court, are the very same conditions that pretrial

22   services themselves indicated were sufficient for her release.

23   So when speaking with her, and they made their own --

24         THE COURT:  We have here the pretrial services

25   officer.

1    MR. KESSLER-CLEARY:  Yes, sir.

2    THE COURT:  I'll have a question for you, sir, at the

3 end.

4    MR. KESSLER-CLEARY:  Certainly, your Honor.

5    MR. BELL:  So when pretrial services made their own

6 independent analysis of this matter, they themselves came up

7 with this list which I just really cited back to the Court as

8 being, I thought, a reasonable set of circumstances that would

9 have allowed her to be out on the street, to go back to her --

10    THE COURT:  Go ahead.

11    MR. BELL:  And to be gainfully employed, to be able to

12 support herself and her son.

13    THE COURT:  Focus on danger to the community for a

14 moment.  The government's thesis is that she has been behind

15 the scenes, if you will, assisting MS-13 in the variety of ways

16 that Ms. Sassoon listed, and that is something that, given the

17 nature of her role, she has been able to do it from her home.

18    MR. BELL:  Allegedly.

19    THE COURT:  I understand.  But there's an indictment,

20 and there's probable cause that's been found by a grand jury.

21 I can't look behind that.  Given that, even with the various

22 restrictions that are being proposed, how does that

23 meaningfully address the danger to the community?  I get a

24 little better the risk of flight.

25    MR. BELL:  Judge, normally I'm in a situation where

1    the government is saying that there are these list of

2    convictions, there are these list of contacts with law

3    enforcement that shows my client's propensity for danger or

4    propensity not to be someone who can be trusted not to commit

5    any other crimes when they're on the street.

6          I have a client who has no criminal record.  I have a

7    client who has had no negative contact with law enforcement at

8    all.  They site to the situation in which there was an alleged

9    shooting in 2011, if I'm not -- 2014, in which my client was

10   allegedly inside of a car that was stopped.  Allegedly, they're

11   saying other people were arrested, but my client was not.

12         They're saying that in 2011, that she was present when

13   a boyfriend was arrested, and she acknowledged the existence of

14   MS-13.  That, to me, is not a predicate or a value that leads

15   that my client, a 32-year-old woman, who's the mother of two

16   teenage children, who was gainfully employed, that would then

17   thereby lead to this idea that my client is a danger to the

18   community.

19         I have not seen this sort of situation where that

20   would be the case from the government's position.  I would say

21   that when the government is saying -- showing this picture of a

22   firearm or the picture of a flag, my question is:  In what

23   context?

24         THE COURT:  But what about the AK-47?

25         MR. BELL:  But, Judge, there --

J8MPRIVC

1          THE COURT:  Why is there an AK-47 on her phone?

2          MR. BELL:  I don't understand what this means.  What

3    does this mean, Judge?

4          THE COURT:  Sorry.  All I can do, at this point, is

5    make a bail determination based on the evidence presented, but

6    it is suggestive to have a photograph of an AK-47 on one's

7    phone.  What's the benign way to look at that?

8          MR. BELL:  Judge, the Court, nor do I, understand

9    under what circumstances that was found.  I don't know if she's

10   a member of the NRA.  I don't know if she's a law -- whether or

11   not she has a license for a gun.  I have no reason to know.

12   There's all sorts of lawful reasons, First Amendment reasons,

13   why that picture could be there.

14         THE COURT:  Look, sorry.  One moment.  The First

15   Amendment protects a lot of people from saying a lot of things.

16   It doesn't mean that there isn't evidentiary force to what you

17   say.  People are accountable for their words.  They're

18   accountable for the photographs they display.

19         Just because she has a First Amendment right to put

20   something on her phone doesn't mean the First Amendment

21   prevents it from being used against her if it is a building

22   block towards showing danger.

23         I'm asking you -- I'm giving you an opportunity, if

24   there's something fruitful that can be said to explain the

25   AK-47.  That's a new one on me, an AK-47 on the phone.

J8MPRIVC

1      MR. BELL:  My understanding is that there was a

2  picture.  The Court indicated that it was displayed.  I have no

3  information that it was ever displayed.  I have no information

4  whether or not this thing was sent to her.  I have no

5  information whether she sent it to someone else.

6      THE COURT:  Let's pin this down.  Ms. Sassoon, in what

7  part of the phone was the photo of the AK-47 found?

8      MS. SASSOON:  It was served in her photographs, and it

9  had been saved in June of 2019.

10      THE COURT:  Any context you want to -- I mean, I'm

11  happy if you want to confer with your client or not, but if

12  there's some context, I would welcome that because it is

13  troubling to me.

14      MR. BELL:  I understand it could be troubling, Judge,

15  but again, I point to the fact that even if it is true that she

16  saved it on her phone, she's never been -- she is not, in this

17  case -- the government's own acknowledgment is not likely to

18  have a charge, substantive charge of a gun charge.

19      The government is saying she is not likely to be

20  charged with a substantive charge of narcotics, Judge.  So they

21  never found her with a gun.  They don't believe that she ever

22  possessed a gun.  They don't believe that there is a -- the

23  search warrant that I understand that they served found phones,

24  not guns, not narcotics.

25      We're seeing a picture of a gun that we don't know to

1    what extent on why or what -- just because there was a picture,

2    now knowing, under what the government now acknowledges, that

3    she will not be charged substantively with a gun, will not be

4    charged substantively with narcotics.  The fact that they would

5    bring up a picture of a gun here seems to be misplaced to me.

6            I understand why the government would want to do that.

7    It's sensationalizing it, saying that she had a picture of a

8    gun, but they also acknowledge that she did not personally

9    participate in any acts of violence.

10           THE COURT:  I got that.  Tell me about your thoughts

11   on the other photograph.  This is, I gather, an insignia or

12   flag, rather, of the HLS subset of MS-13.  That's what's

13   represented.  What's your response?

14           MR. BELL:  My response would be the same, Judge.  What

15   does it mean?  It's not -- in my estimation, the way I see it,

16   does it mean that she is dangerous?  Does it mean that because

17   she has a picture of this flag, that she herself possessed a

18   gun, actively participated in any acts of violence?

19           Again, I go back to my base position.  She's never

20   been charged with any acts of violence.  She has no criminal

21   record whatsoever.  She was gainfully employed.  If she wanted

22   to flee the jurisdiction after this acknowledgment from the

23   federal government that there is a search, she could have.

24           There was no acts of violence either before or after

25   the search warrant.  The government alleges that she

voluntarily goes to the precinct with law enforcement.

Presumably their position is that she did so voluntarily in a

method to assist in the investigation. That, in my mind, does

not point to someone who is a danger. She didn't feel a fear.

Someone who is allegedly a member of or a leader of

MS-13, the government's position is that they -- that that

person voluntarily goes with officers to a precinct to have a

conversation as part of the investigation. That, to me, does

not sound like someone who was either a risk of flight or a

danger to the community.

If we are surmising her actions, if we are surmising

from her conduct, if we are surmising from her criminal record,

if we are surmising from her employment, her duty to her family

and that she supports her family not only here in the United

States but also abroad, none of those points, as I see it, from

the government's argument, seems to point to someone who is a

risk of flight or someone who is a danger to the community.

One moment, Judge. I just want to review my notes.

(Pause)

One point. Ms. Sassoon spoke to the Court regarding

these alleged conversations on the wiretap, and I believe her

characterization was that she was being careful and/or guarded.

That's a characterization that the government has made. I have

not seen those statements, but it appears to me that that's

sort of a, was she being guarded or cautious, or was she just

1    having a conversation?

2         The government's characterization of a statement for

3    which the government was not able to surmise illegal conduct

4    said that it was guarded or careful.  In my estimation either

5    she's talking about committing violence or the threat of

6    violence, either she's talking about the idea that she's

7    fleeing from the jurisdiction and would give the Court reason

8    to believe that she is fleeing from the jurisdiction, those are

9    the issues.

10        She brings up the issue of whether or not these are

11   broader conversations.  I take from that that the government

12   found that these conversations did not indicate actual criminal

13   activity, did not indicate that she would be a danger to the

14   community, did not indicate that she would be a flight risk.

15        Sorry.

16        (Pause)

17        THE COURT:  Apologize for the delay.

18        MR. BELL:  I would say as far as the issue of where --

19   if the Court were to set some conditions, there are various

20   locations here within the jurisdiction that we believe that we

21   could have her reside.  It would, of course, be our position

22   that she be allowed to go back to her employment, where she was

23   gainfully employed and the like.

24        If the Court sees that as a potential issue because of

25   it being that she would be in Virginia, although there are

J8MPRIVC

1  definitely cases for which this Court and others have allowed

2  people to go back to their lives and then commute back from

3  their home state.  I've spoken with the family, her father, and

4  they would be able, with other family here in New York, would

5  be in a position to make sure that she would be able to reside

6  here in the Southern District of New York.

7        THE COURT:  All right.  Thank you, Mr. Bell.

8        Let me just ask a few follow-up questions of the

9  government.  Let's just come back to the proffer notes.  Those

10  were found on her phone, correct?

11        MS. SASSOON:  Yes.  Yes.

12        THE COURT:  And wire transfers --

13        MS. SASSOON:  Yes.

14        THE COURT:  -- defense counsel says that he's able to

15  isolate some wire transfers that are for the family.  Are you

16  relying on those at all in your application?

17        MS. SASSOON:  No, your Honor, and I'd like to make

18  three points, and one is with respect to that.

19        As your Honor inferred, we're not claiming every

20  single transaction was an MS-13 transaction.  What I can

21  represent to the Court is that of over 250 transactions between

22  2014 and 2019, law enforcement agents on this case have

23  identified 146 transfers being made to and from MS-13 members.

24        THE COURT:  And those exclude the mother and the

25  brothers?

1    MS. SASSOON:  I'm assuming that that's the case.  If

2    there are about a hundred that were not to known MS-13 members,

3    I think the family would be in that category, but I can give a

4    few concrete examples of the types of transfers that have been

5    identified.  For example, 47 transfers were made --

6         THE COURT:  Seven or 47?

7         MS. SASSOON:  -- 47 to and from an MS-13 member, who's

8    indicted in the Western District of North Carolina for

9    racketeering conspiracy.  Twenty transfers were made to another

10   MS-13 member, who's incarcerated in the BOP, and who has

11   self-identified as MS-13.

12        MR. BELL:  I'm sorry, I missed the number.

13        MS. SASSOON:  Twenty.  The defendant has sent and

14   received payments from another individual, who's imprisoned

15   Maryland for his involvement in an MS-13 homicide on Long

16   Island.  With respect to El Salvador, law enforcement agents

17   have identified dozens of payments to individuals in

18   El Salvador who are documented MS-13 members, and my

19   understanding is that that is based primarily on law

20   enforcement intelligence and criminal history of these

21   individuals.

22        So those are just some examples to illustrate the ways

23   in which we've identified payments.

24        THE COURT:  A question or two about that.  What dollar

25   amount are we talking about of your typical wire transfers to

J8MPRIVC

1  the people you're talking about?

2          MS. SASSOON:  Small increments, about a hundred

3  dollars.

4          THE COURT:  And if money is going out, it's coming in

5  from somewhere.  Are there wire transfers in, beyond her

6  employment?

7          MS. SASSOON:  Yes, including from some of the people I

8  identified.

9          THE COURT:  Okay.  So these are wire transfers in, as

10  well as out?

11          MS. SASSOON:  Yes.

12          THE COURT:  And the 47, for example, I think you

13  described, and maybe I miswrote it.  I wrote it down as out.

14  Is that actually in and out?

15          MS. SASSOON:  Those were out.

16          THE COURT:  Tell me about the money coming in.  That's

17  interesting.

18          MS. SASSOON:  So with respect to the notes I have here

19  with me, there are documented payments from inmates who are

20  actually in prison.  And with respect to the methods of

21  collection, our understanding from witnesses is that the

22  defendant would sometimes direct MS-13 members to directly

23  transfer money to other MS-13 members or into different

24  accounts, other than the one that's in her name.

25          THE COURT:  Okay.  Thank you.

J8MPRIVC

1          MS. SASSOON:  So that was one point I wanted to

2     address.

3          Two more points.  With respect to the lack of criminal

4     history, as I mentioned before, it's common for leaders within

5     a criminal organization to be harder to catch, and it's easier

6     for them to successfully evade law enforcement for a long

7     period of time.  And here, there's evidence of sustained

8     involvement with a gang, and I've identified some of the ways

9     we know that.

10         The fact that she didn't flee the day of the search,

11    when there was no arrest warrant for her, isn't particularly

12    surprising or notable, given that she has evaded law

13    enforcement all this time, including when they've appeared on

14    her doorstep or arrested other people.

15         THE COURT:  Well, I mean, to Mr. Bell's point as to

16    the risk of flight, as opposed to the danger to the community

17    factor, the fact that law enforcement is on her tail enough to

18    do a search warrant and she still doesn't flee, does say

19    something about her appetite for flight.

20         MS. SASSOON:  Well, at the time of the search, for one

21    thing, law enforcement agents came upon her trying to wipe her

22    phone, and they seized the phone as she was in the course of

23    trying to do that, but there is a substantial --

24         THE COURT:  What observation did they make that

25    indicated that she was trying to wipe her phone.

1          MS. SASSOON:  She was on the actual screen that allows

2     you to select wiping the phone.

3          And I would submit that there is a difference between

4     a search and actually facing a federal indictment.  And the

5     fact that she voluntarily went and gave an interview, while she

6     lied in that interview, and so again, our conclusion from that

7     is that she thought she could successfully evade prosecution

8     again.

9          One point about the rule 16 evidence that goes to

10    danger, some of these warrant applications contain information

11    about witness statements, and it is possible that, in reading

12    these warrants, the defendant will make certain inferences

13    about who these witnesses are, which is of grave concern to the

14    government, especially because some of the people we've

15    mentioned she's had direct contact with, are people who have

16    not only been involved in violence, but the type of brutal

17    violence that MS-13 is notorious for, including committing

18    murders because someone makes the wrong hand gesture or signal.

19    And so you can imagine the types of things they would do to

20    someone suspected of cooperating at the defendant's direction.

21          With respect to the fact that we stated she was

22    guarded in the wiretap, I thought I could give an example, to

23    give your Honor a flavor of that.  For example, some of the

24    calls she talks about soccer games, and it's our understanding

25    from our witnesses that that's actually a reference to MS-13

1    gang-related meetings, and so there's coded language.

2              THE COURT:  Who is she speaking to when she says

3    soccer games?

4              MS. SASSOON:  Identified MS-13 members.

5              THE COURT:  As opposed to the mother or brothers?

6              MS. SASSOON:  Correct.  And as I mentioned, there are

7    other forms of communications, like chats, where she's less

8    guarded.  If your Honor has further questions --

9              THE COURT:  I don't.  Let me just thank you, though,

10   very much.

11             Let me just direct myself for a quick moment to the

12   pretrial services officer, and then we'll take a quick break.

13             MS. SASSOON:  Your Honor, I just wanted to correct one

14   thing.  Mr. Bell referred to the fact that we didn't say

15   anything about the defendant possessing firearms.  We do have

16   witness testimony that the defendant directly handled a firearm

17   that she implied had been used in a crime.  I haven't provided

18   a lot of detail about that for the same reason I've expressed,

19   we have witness safety concerns.  So I'm not asking your Honor

20   to heavily rely upon that, but I did want to --

21             THE COURT:  Is any dimension of your present

22   reluctance to charge a substantive firearm or drug count, venue

23   related?  In other words, if you had nationwide venue here,

24   would you be looking at your charging possibilities more

25   broadly?

1         MR. SCOTTEN:  So, no, your Honor.  Frankly, there's no

2    reticence to charge the narcotics conspiracy, which venue could

3    easily lie here because it's very easy to do transit for a

4    narcotics conspiracy.  The drug involved is marijuana.  It's

5    not going to add anything to the sentencing exposure; so

6    there's no reason that we would use it.

7         THE COURT:  I see.

8         MR. SCOTTEN:  On the firearm, it's entirely a matter

9    of legally uncertainly as to how you hang a 924(c) charge on a

10   racketeering conspiracy in light of Davis and Dimaya.  It's not

11   a factual concern at all.

12        THE COURT:  I see.

13        MR. SCOTTEN:  We could charge things like firearms

14   trafficking, but we didn't want the Court to not see those

15   charges and think we had misled it.  It's probably more

16   sensible to just list them all under racketeering, but it's not

17   a factual concern.

18        THE COURT:  Very helpful.  Thank you.

19        Is that Officer Kessler-Cleary?

20        MR. KESSLER-CLEARY:  Yes, it is, your Honor.

21        THE COURT:  First of all, thank you, as always, for

22   the very thoughtful report.  The simple question is this.

23   You've heard a lengthy presentation from the government today

24   with respect to danger to the community.  How much of that did

25   you know when you made your recommendation to me?

1    MR. KESSLER-CLEARY:  Very little, your Honor.  I was

2  in touch with the government after my interview with Ms. Rivas.

3  As the Court is aware, pretrial can only, to a certain extent,

4  take into account the facts of the case.  The nature of the

5  instant offense is a concern that was noted both in the

6  assessment of danger and non-appearance.

7    THE COURT:  Here's the bottom line question.

8    MR. KESSLER-CLEARY:  Certainly.

9    THE COURT:  At the time you prepared your report, you

10  had the very limited knowledge you had?

11    MR. KESSLER-CLEARY:  Yes.

12    THE COURT:  You've now had the benefit of an hour of

13  colloquy, in which, among other things, the government has made

14  representations about its proof.  Does pretrial stand by its

15  recommendation?

16    MR. KESSLER-CLEARY:  Based upon some of the specific

17  information posed by the government, I think, at a minimum, it

18  would raise supervision concerns and whether specifically our

19  assertion or recommendation of location monitoring would

20  adequately account for a danger to the community.

21    The recommendation for home detention enforced by GPS

22  is based on an understanding that we would know where the

23  defendant is, but it does not allow us to know what's happening

24  when they're in a given location.

25    THE COURT:  Given the way that Ms. Sassoon has

J8MPRIVC

describe the nature of the defendant, which is something of a

puppeteer behind the scenes, does that make you rethink your

danger-to-the-community view; i.e. the conditions can

reasonably assure the danger to the community?

MR. KESSLER-CLEARY:  It certainly would add more

elements to our assessment of the danger, your Honor.

THE COURT:  All right.  We've been at this for a

little while.  I'm going to take a five-minute comfort break,

and I'll be right back to rule.

MR. KESSLER-CLEARY:  Thank you.

(Recess)

THE COURT:  All right.  Be seated.  All right.  Let me

begin just by thanking counsel, Ms. Sassoon and Mr. Bell.

Thank you very much for very thoughtful, helpful, detailed

presentations.

The government is seeking to detain Ms. Rivas on two

grounds, on both of which it bears the burden.  The government

bears the burden by a preponderance with respect to risk of

flight and bears the burden by clear and convincing evidence

with respect to a danger to the community.

I regard a risk of flight question as a close one, and

I'm not going to rule on the basis of it.  I would note that

Mr. Bell has made substantial arguments that the defendant had

an opportunity to flee when on notice of an investigation

apparently directed at her and did not do so.  And an

1    impressive bail package, from the perspective of the risk of

2    flight, has been proposed.  I find that a close question.

3    There's no need for me to reach it.

4        I do, however, find that the government has satisfied

5    its burden of demonstrating by clear and convincing evidence

6    danger to the community, and on that basis, I am going to order

7    the defendant's detention.  Briefly, here is why.  I fully

8    respect that Ms. Rivas does not have a prior criminal record.

9    That is significant to me.

10        As an aside, she does, however, have a prior history

11   of being close to the flame.  There are several instances,

12   including the arrest of her boyfriend, in which she has prior

13   associations with MS-13.  I respect the fact that she has not

14   to date been arrested, but the government has amassed

15   substantial evidence, going back some period of time, of at

16   least consorting with members of MS-13.

17        It remains to be seen what a trial will show as to

18   what the nature of those contacts were, but I do have respect

19   for the fact that she does not have a prior criminal record.

20   I, therefore, do not hold any of her prior activities against

21   her in the way that, for example, a long history of prior

22   crimes would suggest an ongoing danger to the community.

23        Nevertheless, the government here has proffered a

24   substantial amount of evidence indicating aid, comfort, aiding

25   and abetting the activities of a deeply violent and profoundly

antisocial gang.  MS-13 is notorious for its acts of murder and

assassination, including of children, and that is important

context in evaluating the danger presented by somebody who's

alleged to have been a behind-the-scenes contributor.  That is

essentially exactly the allegation here.

The government represents that, both through physical

evidence in the form of electronic communications and in the

form of witness statements, there is evidence indicating that

Ms. Rivas has played a leadership role in a violent sect of

this violent gang.  It's not clear that she has any official

title, but the government's representation, which I credit

based on the evidence proffered, is that this defendant has a

long-standing and active role in that sect of the gang.

Of particular concern to me, though, is the physical

evidence that the government represents that suggests a means

of instigating or fomenting gang activity.  The government

represents, in particular, that a very large number of wire

transfers have gone from this defendant's account to not one,

not two, but at least three identifiable members of MS-13; 47

transfers to somebody from MS-13, who's under indictment in

North Carolina; 20 to an MS-13 member, who is self-identified

as MS-13 who's in the Bureau of Prisons; another person in

Maryland.

There may well be a defense for all of that, but on

the basis of what's been proffered, that is compelling evidence

J8MPRIVC

of aiding and assisting MS-13. Even at $100 a pop, if that's

the average or normal quantity, that's a substantial amount of

transfers of material amounts of money assisting people

affiliated with this different gang. And while any one

individual recipient could be easily passed off as perhaps

reflecting a coincidence that that person is MS-13, the

connective tissue among those three recipients is MS-13.

I was also deeply troubled to learn of the presence on

the defendant's phone of what appear to be proffer notes of

somebody who is viewed as a potential cooperator. It's not

clear how that came to be there, but there's no coherent

explanation of what that is doing there that doesn't raise

grave concerns about retaliation. And I would note that a

signature social risk presented by MS-13 is its capacity and

inclination to retaliate against witnesses against it, whether

insiders or not.

Secondarily, but not irrelevant, I note that on the

defendant's phone is a photograph of an AK-47. Yes, it's

possible she's a member of the NRA, but under the facts

proffered, the much greater, more likely inference is that this

is HLS, not NRA, related. And the presence of what the

government says is a flag associated with HLS, again, appears

to reflect a degree of sponsorship or adoption or affiliation

with a dangerous gang.

The bottom line is that the government has proffered

J8MPRIVC

substantial evidence of a means of supporting a gang.  To be
sure, not firing the bullet, not plunging the dagger, but
assisting those who do.  Particularly given the means by which
the defendant is alleged to have participated in the gang, I
don't think that the bail conditions, muscular as they may be
with respect to a risk of flight, are really up to the
challenge of protecting society against the particular risks
presented by this defendant.

         As proffered by the government, Ms. Rivas is something
of a PayPal for MS-13.  She can do that from her home, and even
if her phone were taken away, she could do that from a phone of
a loved one or some other electronic within the home.  Unless
eyes are to be on her 24/7, it's hard to see how as long as she
has access to any form of communication device, she can't
further MS-13 in one or more of the ways that have been
alleged.

         Therefore, even if we are talking about home
detention, I think that would simply be functioning as putting
her in the very place that appears to have been a situs of the
alleged activity.

         So with respect, with great respect to Mr. Bell for
the vigor of the advocacy and for the bail package that's been
put together, I don't think it's up to or equal to the task of
guarding against the danger to the community presented by your
opponent.  I would say this, that you are about, Mr. Bell, to

J8MPRIVC

1    receive a substantial amount of discovery in this case.

2              At this point, we're all reliant on the

3    representations by the government.  Some of them, by their

4    nature, won't be testable by the Rule 16 evidence in the nature

5    of witness statements, but it may be that, as you become more

6    familiar with the evidence, you choose to come back to me to

7    reargue the point, I won't resist that, but you need to be

8    prepared to address coherently the very concerns that I've

9    articulated here today.

10             In any event, for all the reasons stated, I find that

11   the defendant is, by clear-and-convincing evidence, a danger to

12   the community that can't be redressed by the bail package that

13   has been presented or, really, any that I can easily imagine

14   right now.  So for all those reasons, I am signing now an order

15   affirming the detention of Ms. Rivas.

16             All the more reason, I should say, for the trial date

17   that I have set.  It gives, Mr. Bell, you five-and-a-half

18   months to get ready for trial, but the intrusion on your

19   client's liberty interest is now as significant as it can be.

20   She will be detained, presumptively, all the way through trial.

21   All the more reason for everybody to work post haste to make

22   sure that the case does get tried on February 3rd.

23             Is there anything further from the government?

24             MS. SASSOON:  No, your Honor.

25             THE COURT:  All right.  Anything further from the

1    defense?

2            MR. BELL:  I think there's a matter of medical

3    treatment.  I would prefer to approach, if the Court would be

4    inclined to allow that, instead of it being on the record,

5    though.

6            THE COURT:  I take it you're not asking that it be

7    ex parte.

8            MR. BELL:  No, of course not.

9            THE COURT:  All right.  Let me have government counsel

10   and Mr. Bell come to the sidebar for a moment.  I'll make a

11   judgment at that point whether I need to put something on the

12   record.

13           MR. BELL:  Thank you.

14           (Sidebar had off the record)

15           THE COURT:  Mr. Bell, Mr. Smallman tells me that the

16   form that I have just signed is not one that will go to the BOP

17   in a way that can be used; therefore, I think what I need is an

18   order from you that I can sign that encourages or directs the

19   Bureau of Prisons to give due attention to the medical issues.

20   Get me something overnight, and I'll happily issue it first

21   thing in the morning.

22           MR. BELL:  Thank you for your time.

23           THE COURT:  Just for the record, at the sidebar, I

24   discussed with counsel a specific medical situation that

25   Mr. Bell is anxious to make sure that Bureau of Prisons'

1    medical personnel attend to, and he's quite right.  There's no

2    reason for the public record to list the specific nature of the

3    medical ailment, but I'm in full agreement that the Bureau of

4    Prisons ought to be encouraged to give close attention to the

5    issue, and I will issue an order to that effect.

6              Anything further from anyone?

7              MS. SASSOON:  No.

8              MR. BELL:  No.

9              THE COURT:  All right.  Thank you.  We'll stand

10   adjourned.

11             (Adjourned)